IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

HALEY HARRIS,                          *

    Plaintiff,                        *

vs.                                    *        CASE NO. 4:20-CV-176 (CDL)

SAM'S EAST, INC.,                      *

    Defendant.                        *

_____

<u>O R D E R</u>

    Plaintiff Haley Harris claims that she was subjected to a sexually hostile work environment while employed by Defendant Sam's East, Inc. ("the Company") and that, after she complained about it, the Company fired her. She maintains that the Company terminated her employment in retaliation for her complaints and that the Company was also motivated by her race and gender. Harris contends that the Company's conduct violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981. The Company filed a motion for summary judgment as to Harris's termination claims but did not seek summary judgment as to her hostile work environment claim except in a reply brief, claiming it was not on notice that Harris was asserting such a claim. For the reasons explained in the remainder of this Order, the Company's motion (ECF No. 20) is granted as to Harris's hostile work environment claim, gender-motivated termination claim, and

retaliatory termination claim based upon her complaints of a racially hostile work environment.  The Company's motion is denied as to Harris's retaliatory termination claim based upon her complaints of a sexually hostile work environment and race-motivated termination claim.

## SUMMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

## FACTUAL BACKGROUND

These types of cases are particularly fact intensive. Therefore, a careful examination of the facts giving rise to the claims is required.  Because the ultimate consequence of granting a motion for summary judgment is to deny Harris the right to have

her claims heard by a jury, the Court must view the facts in the light most favorable to her.

## I.   The Allegedly Hostile Work Environment

Harris, a white woman, began her employment with the Company at the Sam's Club store in Columbus, Georgia in 2015.  The Company hired Alfredo Otero, an Hispanic man, in September 2017 as an hourly associate to work in the same store as Harris.  Shortly thereafter, Otero told Harris that she "was hot between the legs and [she] couldn't stop having sex."  Harris Dep. 51:5-7, ECF No. 20-3.  He also accused Harris of "murdering [her] babies every month" because she was on birth control.  *Id.* at 51:12-14.

Harris and Otero reported to the same assistant managers, who ultimately reported to the store's manager, Madeline Torres, an Hispanic female.  Harris complained about Otero's remarks to an assistant manager, who confronted Otero about them in front of other employees.  Otero Dep. 15:12-22, ECF No. 20-8.  Otero then complained to Torres that Harris asked him about his Catholic beliefs.  Torres Dep. 8:23-9:10, ECF No. 20-7.  Torres asked Harris to attend a meeting with Otero to discuss these complaints, but Harris did not want to have the meeting.  Harris Dep. 53:2-6. Harris and Otero did eventually meet with Torres and another manager within Otero's first ninety days at the Company.  In that meeting, Torres emphasized that they should not discuss these matters at work.  *Id.* at 56:5-8; Torres Dep. 10:5-10.  Based upon

the present record, the inappropriate comments ceased for about a year and a half after this meeting, because Harris and Otero "avoided each other" and "didn't speak to each other" during that period.  Harris Dep. 68:24-69:9.

In May 2018, Seth Skahan, an Hispanic man, started working at the Columbus Sam's Club.  Skahan and Harris became friends, and they socialized occasionally outside of work.  Harris maintains that they never had a romantic or sexual relationship.  When other employees who were friends of Otero and Skahan learned that she was seeing Skahan outside of work, they began harassing Harris, specifically asking her if she wanted to have sex with Skahan. *Id*. at 74:14-17, 77:18-20.  She responded that Skahan was "too young."  *Id*. at 74:18.  Based upon the circumstances, Harris believed that Otero told other employees that Harris liked Skahan and wanted to have sex with him.  Harris Aff. ¶ 17, ECF No. 24-5. Harris also believed that Otero sometimes implied to other employees that Harris was promiscuous.  Harris Dep. 78:13-17.

Otero maintains that Harris initiated the sexual banter and even suggested that they should have a threesome with Skahan, which could include another employee or her husband.  Otero Dep. 38:1-14, 73:2-4.  Harris denies suggesting a threesome.  Harris Dep. 204:4-10.  She contends that Otero once talked about Harris, Otero, and Skahan having a threesome to make Skahan "uncomfortable."  *Id*. at 80:18-20.  These comments about Skahan occurred between May

4

2018, when Skahan joined the Company, and April 2019.  Harris has pointed to no evidence that she promptly reported her fellow employees' comments regarding Skahan to any manager or supervisor.

The next inappropriate comment that Harris points to occurred in April 2019, when another fellow employee, Bernicia Johnson, a black woman, yelled across the Club's sales floor, "hey, Haley [Harris,] Seth [Skahan] needs some pussy." *Id*. at 88:8.  Harris responded that she did not "sleep with children."  *Id*. at 78:17-22.  In May 2019, Harris told Otero that his "boyfriend," meaning Skahan, "is downstairs waiting for you." *Id*. at 83:6-9.  Otero responded by asking whether Harris had "fucked [Skahan] yet?" *Id*. at 83:9-10.

## II.  **The Investigation**

### A.   Harris's Complaint to Lee

Having finally had enough, Harris complained in May 2019 to Assistant Club Manager Nielani Lee about "sexual harassment in the workplace."  Lee Dep. Ex. 2, Lee Complaint to Global Ethics 2, ECF No. 20-5 at 55.  She specifically complained about Otero's "hot between the legs" remark, which she had previously reported to Torres, and she complained for the first time about Otero's threesome suggestion and the sales floor incident with Johnson. *Id*.  Because Harris felt Torres "mishandl[ed]" her previous complaints, Harris asked that Torres not handle this one.  *Id*. She believed that Torres would show partiality towards Otero

because both were Hispanic.  Harris specifically informed Lee that Torres "looks out for her own," by which Harris meant that Torres favors "people that are of the same race as her."  Harris Dep. 120:7-19.  Harris testified that Lee affirmed that Torres "has a tendency to look out for her own."  *Id.* at 121:1-4.

Lee reported Harris's complaints to the Company's Global Ethics division, which is responsible for ethics compliance within the Company.  When Global Ethics followed up on this report, Lee relayed to them that Harris "felt discrimination; she's white and [Torres and Otero are] both Puerto Rican."  Lee Dep. Ex. 3, Global Ethics Follow-Up with Lee 1, ECF No. 20-5 at 59.

Global Ethics launched an investigation into Harris's complaints.  It initially identified Otero and Johnson as subjects of the investigation.  Peck Dep. Ex. 3, Case Details 1, ECF No. 24-13 [hereinafter Case Details].  Harris and Torres were described as other involved parties, and Skahan was listed as a witness.  *Id.*  Global Ethics eventually expanded the investigation's scope to include allegations that Harris sexually harassed Skahan.  *Id.* at 44-45; Peck Dep. 67:16-68:3, ECF No. 20-4.  Global Ethics never told Harris that she was being investigated for her alleged sexual harassment of an employee.  Peck Dep. 67:2-68:8.

B.   Global Ethics's Interviews

Global Ethics interviewed several employees as part of the investigation.  During Harris's interview, she described the

sexual harassment allegations leading to her complaint, which included Otero's "hot between the legs" and "murdering [her] babies" remarks, Otero's threesome suggestion, and the sales floor incident.  Case Details at 8-9.  Harris told Global Ethics that both she and Skahan asked Otero to stop making sexual comments about them.  She also explained that she tried to cope with the situation by "laugh[ing] about it."  *Id*. at 9.  Global Ethics did not ask Harris about any allegations her fellow employees made against her.  And Global Ethics never talked to Harris after their initial interview.

During his Global Ethics interview, Otero denied ever saying that Harris was "hot between the legs" or "killing her babies every month" by being on birth control.  *Id*. at 14.  He said that Johnson made the sales floor remark.  *Id*. at 15.  Otero told the investigators that Harris "kept telling [Skahan] what she would do sexually to him," "was almost begging him to lose his virginity to her," and "made comments about having a threesome" with Otero and Skahan.  *Id*. at 14, 18.  Harris denies making these comments, and Global Ethics did not ask her about them.

In her interview, Johnson admitted to making the sales floor remark.  *Id*. at 23.  She explained in a follow-up statement that, on the sales floor, Otero and Skahan asked Johnson whether Johnson "wanted to give [Skahan] some," but Johnson said no and that prompted her to ask Harris "the same thing."  *Id*. at 29.

7

Skahan told Global Ethics that Harris did "make sexual comments toward" him. *Id.* at 31. According to Skahan, Harris said that "she had feelings for" him and that when he had a bad day that he "just need[s] to get laid." *Id.* Skahan also reported in his interview that Harris "would talk to other associates about" having sex with Skahan. *Id.* But Skahan said that Harris's sexual comments never made him "uncomfortable, [he] just ignored it." *Id.* Harris admits that when Skahan told her that he was stressed, she commented, "when I am stressed, I go get laid," and Skahan did not "act offended." Harris Aff. ¶ 28. Harris denies expressing a sexual interest in Skahan, and Global Ethics did not ask her about Skahan's interview answers.

When Torres was interviewed, she told Global Ethics that Harris did not report sexual harassment to her, but that Lee told Torres "what was going on" with Harris's complaints. Case Details at 38. In a follow-up statement to Global Ethics, Torres said that she had not "received any reports . . . about sexual harassment" from Harris or Otero. *Id.* at 40. According to Torres, Harris had previously accused another associate "of sexual harassment." *Id.* at 41. During the investigation into that accusation, which occurred when Torres was the Columbus Sam's Club's co-manager, the associate Harris named in the investigation "quit and said it was because [Harris] made false allegations

[against] him and he didn't want his wife to find out." *Id.* at 41; Torres Dep. 35:2-5.

### C.   Global Ethics's Findings and Recommendations

Based on its investigation, Global Ethics made the following findings: (1) Johnson made an inappropriate comment toward Harris on the sales floor regarding Skahan, (2) Harris made inappropriate comments of a sexual nature toward Skahan, and (3) Harris's allegations regarding Otero's sexual comments toward her could not be corroborated.  Peck Dep. 20:1-22, 28:4-22; Case Details at 44-45.

Based upon its findings from the investigation, Global Ethics made the following recommendations regarding the application of the Company's tiered disciplinary policy.  That policy included four disciplinary action levels: first, second, and third written disciplinary actions, and termination.  Peck Dep. Ex. 16, Disciplinary Action Policy 2-3, ECF No. 24-8 [hereinafter Disciplinary Policy].  Because Johnson's inappropriate comment was isolated, it recommended giving Johnson a second-tier disciplinary action.  Peck Dep. 20:11-19; Peck Dep. Ex. 2, Case Memo 4, ECF No. 24-11.   Global Ethics recommended giving Harris a third-tier disciplinary action "due to multiple witnesses confirming she made harassing sexual comments directed at associates"; it did not recommend terminating her.  Peck Dep. 20:8-10; Case Memo at 4. According to Torres, Global Ethics was aware that Harris had an

active first-tier disciplinary action for attendance issues and
that it was another factor that caused Global Ethics to recommend
third-tier disciplinary action.  Torres Dep. 44:7-17.  And because
it could not corroborate the allegations against Otero, Global
Ethics recommended no disciplinary action against him.

## III. Torres's Alleged Retaliatory Termination of Harris

Under the Company's policies, Global Ethics's recommendations
were not binding on an employee's manager, who was charged with
the ultimate responsibility of disciplining employees under her
supervision.  The Disciplinary Policy stated that an employee's
"manager will refer to the [tiers] in order to help identify which
level of Disciplinary Action is most appropriate based on the level
of severity and/or next progressive DA step."  Disciplinary Policy
at 2.  The Disciplinary Policy authorizes immediate action—"up to
and including termination, regardless of [the employee's] current
level of Disciplinary Action"—if "any legal, compliance, safety or
ethical violations occur."  *Id*.; Engel Dep. 17:5-25, ECF No. 20-6
(stating the Disciplinary Policy gave "managers the discretion" to
skip intermediate tiers to "immediate termination" if warranted).
It is undisputed that the Disciplinary Policy does not guarantee
employees the opportunity to correct misconduct, depending on the
severity of the offense.

After receiving the Global Ethics recommendation in September
2019, Torres fired Harris.  Torres Dep. 52:9-11.  She decided to

fire her instead of following the Global Ethics's recommendation of a third-tier disciplinary action because Harris had another active disciplinary action on her record.   Torres Dep. 59:5-11. That disciplinary action arose from Harris's alleged tardiness and unexcused work absences, and had been taken into consideration by Global Ethics when it made its recommendation.

After being notified of her termination, Harris appealed that decision within the Company pursuant to Company policies.   The appeal report stated that Harris "feels her termination was wrongful because she had a sexual harassment case against someone in the store. . . [and] was not informed there was an investigation against her."   Peck Dep. Ex. 11, Hotline Report 2, ECF No. 24-19. While the appeal report did not include allegations of race discrimination, Harris says that race discrimination and sexual harassment were "all tied together."   Harris Dep. 118:5-11.   Harris never received a response to her appeal, although the Company opened an investigation on it.   Hotline Report at 1.   Harris then filed this action, claiming race and gender discrimination and retaliation under Title VII and race discrimination and retaliation under § 1981.

DISCUSSION

Harris clearly alleges that the Company terminated her in retaliation for her complaints about sexual harassment and that the Company's termination was also motivated by her race and

gender.[1]  The Company moved for summary judgment as to these claims. It is less clear that Harris alleged a standalone claim for a sexually hostile work environment.  Failing to ascertain such a claim from Harris's complaint, the Company did not address a hostile work environment claim in its originally filed motion for summary judgment except as Harris's allegations of sexual harassment related to her retaliatory termination claim. Therefore, the Court must preliminarily determine whether a hostile work environment claim was alleged in the Complaint and, if it was, whether the Company is entitled to summary judgment on that claim notwithstanding its failure to include it in its originally filed motion for summary judgment.

## I.   Harris's Hostile Work Environment Claim

Harris's complaint is replete with references to sexual harassment.  Compl. *passim*, ECF No. 1.  The complaint also describes specific sexual comments that Harris claims amounted to sexual harassment.  And the complaint generally asserts a claim for gender discrimination.  Thus, the Company was clearly on notice that Harris was alleging that one or more of its employees sexually harassed her.

---

[1] The Company acknowledges that a liberal reading of Harris's complaint also reveals a discrimination claim based on disparate job opportunities. The Company moved for summary judgment on this claim.  Harris did not respond to that portion of the motion, so this claim is deemed abandoned. *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

But these allegations alone do not establish a claim for hostile work environment. A hostile work environment claim requires proof that "the harassment was sufficiently severe or pervasive to alter the terms and conditions" of the employee's employment AND that there is a basis for holding the employer liable for the employee's harassment. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). It is important to note that Harris's allegations of harassment against her fellow employees were necessary to support her retaliation claim. *See, e.g., Tatt v. Atlanta Gas Light Co.*, 138 F. App'x 145, 147 (11th Cir. 2005) (per curiam) (for a Title VII retaliation claim, the employee's complaints that caused her termination must constitute "statutorily protected expression," which requires a showing that the employee had a subjective belief that she was subjected to unlawful discrimination/harassment and that the belief was objectively reasonable.) Therefore, the presence of the sexual harassment allegations, standing alone, does not necessarily state a claim for hostile work environment. It would not be unusual for an employee who was fired after complaining of sexual harassment by a fellow employee to sue the employer for retaliation and not a hostile work environment. The Company here was not unreasonable in reaching this conclusion based on Harris's complaint.

Even if the Court allowed Harris to amend her complaint to clarify that she intends to assert a hostile work environment claim, that amendment would be futile.  There are no factual allegations in the present complaint or any evidence in the well-developed factual record that would support holding the Company liable for co-employee harassment.  For example, no facts have been presented from which a reasonable jury could conclude that the Company had no policy in place to prevent such harassment or that the Company did not meaningfully investigate the harassment.  Without such allegations in the complaint, it was reasonable for the Company to conclude that, while Harris was asserting a retaliation claim based upon her complaints of sexual harassment, she was not asserting a hostile work environment claim.  And it would be appropriate to find that no such claim is being asserted in this action.  *See, e.g.*, *Palmer v. Albertson's LLC*, 418 F. App'x 885, 889-90 (11th Cir. 2011) (per curiam) (affirming the district court's conclusion that a plaintiff did not bring a hostile work environment claim in his complaint when none of his counts was a hostile work environment claim, and that his "use of the words 'harassed' . . . and 'hostile'" in the complaint neither stated a plausible hostile work environment claim nor provided sufficient notice of such a claim to the defendant).

And as previously noted, allowing Harris to assert such a claim now would be futile.[2]  The present record establishes that, when Harris first complained of the harassment, Torres held a meeting and informed Otero that such comments were not appropriate in the workplace.  Otero's harassing comments stopped for at least a year and a half following this meeting.  Then, when Harris complained again after the harassment resumed, the Company opened a formal investigation with an outside unit conducting interviews. That unit could not corroborate Harris's allegations against Otero, but it did substantiate other allegations she made.  In light of the lack of evidence from which a jury could conclude that the Company had inadequate policies in place to prevent harassment or that it did not reasonably investigate the allegations, Harris's hostile work environment claim fails as a matter of law.[3]

_____

[2] The Company addressed Harris's alleged hostile work environment claim for the first time in its reply brief because it did not believe that Harris had asserted such a claim.  Normally, a party cannot move for summary judgment on an issue by raising it for the first time in a reply brief.  Here, though, the Court permitted Harris to file a sur-reply brief to address the hostile work environment claim, so the Court will consider the parties' arguments on this issue. *See Atl. Specialty Ins. Co. v. Digit Dirt Worx, Inc.*, 793 F. App'x 896, 901–02 (11th Cir. 2019) (per curiam) (stating that, when a reply brief contains material not raised in the initial summary judgment motion, the district court may consider the new material if it "permit[s] the nonmoving party to file a surreply").  The Court notes that Harris thus had an opportunity to point to evidence supporting her hostile work environment claim if it existed.

[3] The Court further observes that Harris would likely have a difficult time establishing that the remarks to which she was subjected over an extended period, with a one-and-a-half-year break between the first alleged remarks and the subsequent ones, were "sufficiently severe or

## II.  **Harris's Retaliatory Termination Claims**

Although the present record does not support a hostile work environment claim, Harris's complaints about unlawful sexual harassment were objectively reasonable, and therefore, Title VII prevents her termination because of those complaints.  The Court evaluates this claim using the familiar *McDonnell Douglas* framework. *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009) (further establishing that Title VII and § 1981 claims proceed under the same analytical framework).  Harris must first establish a prima facie case by showing that she "engaged in a statutorily protected activity" and that there is a "causal link between the protected activity" and her termination. *Id*. at 1307–08.  If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a "legitimate, non-discriminatory reason" for the adverse action. *Id*. at 1308.  To avoid summary judgment, the plaintiff must then point to sufficient evidence to create a genuine factual dispute that the defendant's articulated reason was pretextual. *Id*.

The Court finds that Harris has made out a prima facie case of retaliation based on her complaints about sexual harassment. She clearly complained of sexual harassment, and those claims were objectively reasonable.  Her fellow employee made unwelcomed

---

pervasive to alter the terms and conditions of" her employment based on Eleventh Circuit precedent. *Miller*, 277 F.3d at 1275.

comments about her sexuality and harassed her regarding an alleged sexual relationship with a fellow employee. Even if this conduct was not sufficiently severe or pervasive to rise to the level of altering the terms and conditions of her employment, she had a reasonable, good faith belief that it did. *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018) ("An employee's complaint about discrimination constitutes protected activity if the employee could 'reasonably form a good faith belief that the alleged discrimination existed.'" (quoting *Taylor v. Runyon*, 175 F.3d 861, 869 (11th Cir. 1999))). The next question is whether evidence exists from which a reasonable jury could conclude that Harris was terminated because she made these complaints. *Gogel v. Kia Motors Mfg. of Ga.*, Inc., 967 F.3d 1121, 1135 (11th Cir. 2020) (en banc) (stating that a Title VII retaliation plaintiff must demonstrate that, but-for her protected activity, the employer would not have taken the adverse action). As with most cases, the employer here has not confessed to terminating Harris because of her complaints. It claims that it fired her because she harassed a fellow employee and she had an active previous disciplinary charge related to tardiness and unexcused absences. But an examination of the circumstances calls into question the Company's articulated reason for the termination. The pretextual nature of the explanation, combined with other circumstantial evidence,

requires that this claim be decided by a jury and not this Court as a matter of law.

Prior to her complaints about a sexually hostile work environment, no one ever complained that Harris had sexually harassed anyone. In fact, this finding of harassment on her part was discovered during the Company's investigation of her sexual harassment claims against the Company's employees. And even though the Company discovered evidence that Harris may have made inappropriate comments regarding a male employee, Skahan, that evidence likely did not amount to unlawful sexual harassment. According to Skahan, Harris said that "she had feelings for" him and that when he had a bad day that he "just need[s] to get laid." Case Details at 31. Skahan also said in his Global Ethics interview that Harris "would talk to other associates about" wanting to have sex with Skahan. *Id.* But Skahan informed the Company that her sexual comments never made him "uncomfortable," *id.*, and Harris testified he was not offended by her remark about getting "laid." Harris Aff. ¶ 28. Harris denies expressing a sexual interest in Skahan, and Global Ethics did not ask her about Skahan's interview answers. Although Harris was ultimately terminated for her alleged harassment of a fellow employee, she had no meaningful opportunity to present her side of the story. According to her, she was not even asked about it, which could suggest that it was not the true reason for her termination.

Based on these scant allegations, which Harris was not permitted to rebut, her supervisor, to whom she had previously reported sexual harassment, fired her shortly after the investigation was completed. Her supervisor took this action even though the Company took no action against its employee-Otero-who Harris claims had made far more serious and pervasive sexually harassing comments about her and even though the Company's investigators did not recommend Harris's termination. Torres also chose not to terminate Johnson, who made inappropriate comments similar to those made by Harris.

Torres distinguished Johnson from Harris based upon Harris having another disciplinary record in her file related to unexcused absences and tardiness. While employee attendance and punctuality are certainly important, Torres's decision to override the investigators' recommended discipline and her purported conclusion that absenteeism and tardiness tipped the balance here in favor of firing an employee is something that should be considered by the jury. The Court notes that the investigators took Harris's previous disciplinary record into consideration when making its recommendation that Torres rejected. The Court finds that evidence exists from which a reasonable jury could conclude that the Company's articulated reason for terminating Harris's employment was pretextual and that she was in fact terminated because she

complained of a sexually hostile work environment.   Accordingly, summary judgment is not appropriate on this claim.

Although Harris's retaliation claim based on complaints of a sexually hostile work environment survives summary judgment, the Court finds that Harris's retaliation claim based on complaints of race discrimination cannot.  Harris's contention that she was the victim of racial discrimination was not objectively reasonable. In support of this claim, she relies upon her complaint to Lee that Torres "looks out for her own," by which Harris meant that Torres favors "people that are the same race as her," i.e, Hispanics like Otero.  Harris Dep. 120:14-19. According to Harris, Lee responded by vaguely confirming that Torres "has a tendency to look out for her own."  *Id*. at 121:1-4.   Lee relayed to the Company's investigators when they investigated Harris's complaints that Harris "felt discrimination; she's white and [Torres and Otero are] both Puerto Rican."  Global Ethics Follow-Up with Lee at 1.

The Court finds that the present record does not support the conclusion that Harris's complaint of racial discrimination was objectively reasonable.  The only evidence that she points to in support of her claim that the work environment was racially hostile was her frustration that Torres did not seem to be taking her complaints against Otero seriously.  Yet, Torres did counsel Otero not to continue any type of sexual related commentary with Harris. Harris has pointed to no racially tinged comments or other racially

harassing behavior directed to her.  The present record does not support a retaliation claim based upon complaints of race discrimination, and the Company's motion for summary judgment is granted as to Harris's race-based retaliation claims.

### III. Harris's Discriminatory Termination Claims

In addition to her retaliation claims, Harris claims that the Company fired her because she was white and female.  To avoid summary judgment, "the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing," among other elements, "that her employer treated similarly situated employees outside her class more favorably."  *Lewis v. City of Union City*, 918 F.3d 1213, 1220-21 (11th Cir. 2019) (en banc) (internal quotation marks omitted).  Harris points to Otero and Skahan, who are non-white males, and Johnson, a black female, as comparators.

Otero, Skahan, and Johnson are all outside Harris's protected class: they are not white females.  But to be considered a valid comparator, they must be "similarly situated in all material respects" to Harris.  *Id.* at 1226.  To be similarly situated, the comparator generally needs to have engaged in the same basic misconduct, been subjected to the same employment policies, been supervised by the same supervisor, and shared a similar employment and disciplinary history as the plaintiff.  *Id.* at 1227-28.  It is undisputed that the Disciplinary Policy applied to all associates.

Torres supervised Harris, Otero, Johnson, and Skahan.  And each of these associates arguably made sexually suggestive comments that could be deemed to violate the same policies that applied to all four of them.  Yet, the Company did not substantiate the claims against Otero and Skahan, and thus took no disciplinary action against them.  And after substantiating the claim against Johnson, Torres chose not to fire her as she did Harris.

A closer examination of the record reveals that Skahan is not a valid comparator.  Harris argues that Skahan was "informed of the allegations against" him and "allowed the opportunity to defend [himself] and identify witnesses," unlike Harris.  Pl.'s Mem. of Law in Supp. of Pl.'s Opp. to Def.'s Mot. for Summ. J. 15, ECF No. 24-1.  But, during the investigation, there were no allegations against Skahan to inform him of: Harris did not accuse Skahan of misconduct in either her complaint to Lee or her Global Ethics interview.  Lee Complaint to Global Ethics at 2; Case Details at 8-9.  Further, Global Ethics did not investigate, ask Skahan about, or substantiate any misconduct allegation against him.  Case Details at 31-32, 44-45.  And no one reported to Global Ethics that Skahan made a remark that offended anyone.  Because Skahan was not accused of the same basic misconduct as Harris, Skahan is not similarly situated to her in all material respects.

The Court finds, however, that for purposes of evaluating Harris's prima facie case, Johnson and Otero are valid comparators.

Harris contends that Otero, an Hispanic male, engaged in conduct similar to what Harris was accused of but was not disciplined at all.  Harris also asserts that Johnson, a black female, engaged in conduct similar to what Harris was accused of but received a lower tier recommended disciplinary action.  Based on the evidence viewed in the light most favorable to Harris, there is a fact dispute as to whether Otero and Johnson engaged in similar conduct but were disciplined less harshly than Harris.  The Court is satisfied that Harris has made out prima facie case of gender-based disparate treatment using Otero as her comparator and has made out a prima facie case of race-based disparate treatment using Johnson and Otero as her comparators.

With Harris having made out a prima facie case of discrimination, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Lewis*, 918 F.3d at 1221.  The Company stated that it fired Harris because Global Ethics substantiated a sexual harassment allegation against her, which is a legitimate nondiscriminatory reason for an employer to discipline an employee, and because she had an active disciplinary action in her record.  *See, e.g.*, *Moghaddam-Trimble v. S. Fla. Water Mgmt. Dist.*, 479 F. App'x 311, 314 (11th Cir. 2012) (per curiam) (stating that an investigation's determination that an employee sexually harassed her co-worker was a "legitimate nondiscriminatory reason" for disciplining her).  The Company

further asserts that Otero was not disciplined because no one corroborated Harris's allegations about his conduct. The Company also contends that, although Global Ethics substantiated a sexual harassment claim against Johnson, Torres imposed less severe discipline for her because it concluded that Johnson's conduct was an isolated occurrence.

Harris may demonstrate pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in the Company's proffered reason "that a reasonable factfinder could find them unworthy of credence." *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (per curiam) (quoting *Cooper v. S. Co.*, 390 F.3d 695, 725 (11th Cir. 2004)). The Court finds that Harris has failed to point to evidence that the Company's stated reasons for treating her different than Otero were pretextual. The Company's investigation of her claims against Otero did not substantiate that Otero had made statements of an inappropriate sexual nature. No one else corroborated that he had made the sexually charged comments, and Harris points to no evidence to contradict this finding regarding lack of corroboration. On the other hand, the investigation corroborated that Harris had made an inappropriate comment of a sexual nature. Thus, Harris cannot prove that the Company's stated reason for treating her differently than Otero was false or so implausible to be a pretext for gender

discrimination.  Accordingly, her gender-based disparate treatment claim fails.

The Company's stated reason for treating Harris differently from Johnson, however, is a different matter.  As previously explained, that articulated reason—that Harris had an additional disciplinary record for absenteeism and tardiness—is arguably so implausible that a reasonable jury could conclude that the Company's articulated reason for firing Harris was pretext.  This pretext—combined with the fact that her non-white comparator, Johnson, was treated more favorably—requires that Harris's race-motivated termination claim be decided by a jury.

CONCLUSION

For the forgoing reasons, the Court denies the Company's motion for summary judgment (ECF No. 20) as to Harris's Title VII retaliation claim based upon her complaints of a sexually hostile work environment and denies the motion as to her Title VII and § 1981 race-motivated termination claims.  The Company's motion is otherwise granted.  Harris's motion for a hearing (ECF No. 26) is denied as moot.

IT IS SO ORDERED, this 23rd day of May, 2022.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA